

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| VIANNEY ROBLES, | § | No. 08-19-00225-CV |
| Appellant, | § | Appeal from the |
| v. | § | County Court at Law No. 3 |
| AMY NICHOLS, KUBINSKI & NICHOLS, | § | of El Paso County, Texas |
| P.C., ANDRES E. ALMANZAN, | | |
| MOUNCE, GREEN, MYERS, SAFI, | § | (TC# 2019DCV1582) |
| PAXSON, & GALATZAN, P.C., a/k/a | | |
| MOUNCE, GREEN, MYERS, SAFI, | | |
| PAXSON, & GALATZAN, a Professional | | |
| Corporation, | | |
| Appellees. | | |

## DISSENTING OPINION

I respectfully dissent because I believe the court has incorrectly applied the law of attorney immunity to the facts in this case. While it is true that generally, "attorneys are immune from civil liability to non-clients for actions taken in connection with representing a client in litigation[,]" *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651, 657 (Tex. 2020), with some exceptions that are inapplicable here, a lawyer is still "subject to liability to a . . . nonclient when a nonlawyer would be in similar circumstances." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS: LIABILITY TO A CLIENT OR NONCLIENT UNDER GENERAL LAW § 56 (2000). And when an attorney intentionally engages in conduct that violates a criminal statute, that

criminal conduct is "foreign to the duties of an attorney" and is not shielded by attorney immunity if it is committed while performing acts *outside* the scope of client representation. *See Bethel*, 595 S.W.3d at 657-58 ("attorney immunity is not boundless. . . there is a wide range of criminal conduct that is not within the 'scope of client representation' and therefore 'foreign to the duties of an attorney'") (citing *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 483 (Tex. 2015) and *Poole v. Hous. & T.C. Ry.Co.*, 58 Tex. 134 (1882)).

Here, the Court's conclusion that attorney immunity shields Appellees from civil *suit and liability* as a matter of law is tethered to the fact that the acts alleged to have been committed in violation of a criminal statute were committed while furthering the interests of their client in a civil proceeding. But the Texas Supreme Court has never held that an attorney's alleged intentional criminal conduct is immune from civil liability so long as it was committed while representing a client. *See Bethel*, 595 S.W.3d at 658 ("nothing in our attorney-immunity jurisprudence affects an attorney's potential criminal liability if the conduct constitutes a criminal offense").

Rather, as the majority correctly observes in their opinion, the Court has instructed that when considering whether immunity applies, the inquiry must focus on the attorney's conduct, not on the plaintiff's characterization of that conduct. *See Cantey Hanger*, 467 S.W.3d at 483 ("the focus in evaluating attorney liability to a non-client is 'on the kind-not the nature-of the attorney's conduct'. . . Merely labeling an attorney's conduct 'fraudulent' does not and should not remove it from the scope of client representation or render it 'foreign to the duties of an attorney'"); *see also Youngkin v. Hines,* 546 S.W.3d 675, 682 (Tex. 2018) ("we must look beyond Hines's characterizations of activity as fraudulent and conspiratorial and focus on the conduct at issue").[1]

---

[1] In addition to *Bethel* and *Cantey Hanger*, Almanzan relies on *Troice v. Greenberg Traurig, LLP*, 921 F.3d 501 (5th Cir. 2019) for his assertion that a plaintiff's characterization of attorney conduct as criminal, "is immaterial to the

In *Bethel*, the conduct at issue consisted of examining and testing allegedly faulty brakes in a wrongful death suit. *Bethel*, 595 S.W.3d at 653, 658. In *Cantey Hanger*, the conduct at issue consisted of attorneys carrying out a specific responsibility assigned to it by a divorce decree. *Cantey Hanger*, 467 S.W.3d at 485. In each of those cases, the non-client plaintiff complained that the way the attorneys performed the duties *owed to their client* was unlawful. Accordingly, the Court observed that a non-client plaintiff's mere disapproval with how lawyers perform the duties owed to their clients does not remove the lawyer's conduct from the realm of protected activity. *See Bethel*, 595 S.W.3d at 658 ("at bottom, Bethel takes issue with the manner in which [attorneys] examined and tested evidence during discovery in civil litigation while representing Bethel's opposing party. These are paradigmatic functions of an attorney representing a client in litigation"); *see also Cantey Hanger*, 467 S.W.3d at 485 ("Byrd essentially complains that the manner in which Cantey Hanger carried out a specific responsibility assigned to it by the divorce decree. . . Meritorious or not, the type of conduct alleged falls squarely within the scope of [attorneys] representation. . . in the divorce proceedings.").

In *Poole*, however, where the Court held attorney-immunity was unavailable, the conduct at issue involved an attorney facilitating for his client the delivery of goods to which his client was

---

evaluation of the immunity defense." But, the holding in *Troice* is more nuanced. In *Troice,* the plaintiff alleged that the attorneys conspired with their client, R. Allen Stanford, by using their status as attorneys to further the fraud Stanford committed against investors. The plaintiff's contention in that case was that attorneys are *never* immune from suit when they engage in criminal conduct. *Id* at 506. The Fifth Circuit made an Erie-guess that the Texas Supreme Court would **not** carve out a "***categorical***" criminal exception to attorney immunity, but observed "in the usual case, [criminal conduct] will be **outside** the scope of representation [emphasis added.]" *Id.* at 507. However, the *Troice* court never engaged in the analysis of whether the alleged criminal conduct was *in fact* entitled to immunity because "the plaintiffs did not make an alternative argument that immunity does not apply because Greenberg's acts were outside the scope of client representation." *Id.* at 507. The court therefore did not address "any factual questions on this issue." *Id.* In other words, the Fifth Circuit did *not* hold that the attorneys in that case were in fact acting within the scope of their representation when they committed the alleged criminal conduct.

not legally entitled (stealing). Of the attorney's conduct, the Court said:

> Having assumed the apparent ownership of the goods, for the purpose and with the intention of consummating the fraud upon appellant, he will not be heard to deny his liability to appellant for the loss sustained by reason of his wrongful acts, under the privileges of an attorney at law, for such acts are entirely foreign to the duties of an attorney; neither will he be permitted, under such circumstances, to shield himself from liability on the ground that he was the agent of [his client], for no one is justified on that ground in knowingly committing wilful and premeditated frauds for another.

*Poole*, 58 Tex. at 137. Thus, in *Poole*, the attorney used his status as an attorney to accomplish that which his client could not legally accomplish on his own—he acquired possession of the plaintiff's goods without legal authority. And the fact that the attorney committed unlawful conduct while representing his client and in furtherance of his client's interest did not alone automatically shield the attorney of liability.

Here, the attorney conduct at issue is the use and/or disclosure of intercepted[2] oral communications between Appellant and various third parties. Such interceptions are illegal under Texas law. *See* TEX. PENAL CODE ANN. § 16.02(b)(1) ("[a] person commits an offense if the person . . . intentionally intercepts, endeavors to intercept, or procures another person to intercept or endeavor to intercept a wire, oral, or electronic communication"). Moreover, and more pertinent to the discussion here, is that *any* actual or *attempted* disclosure or use of the *contents* of an oral communication that was intercepted violates the Texas Penal Code if the person who engages in such conduct *knows, has reason to know*, or is *reckless* about whether the contents were illegally

---

2 "Intercept" is defined as "the aural or other acquisition of the contents of a wire, oral, or electronic communication through the use of an interception device." TEX. CODE CRIM.PROC.ANN. art.18A.001(13); *see also* TEX. PENAL CODE ANN. § 16.02(a)(1) (instructing "intercept" "[i]n this section" has meaning assigned by Article 18A.001 of Code of Criminal Procedure). "Interception device" is defined in relevant part as "an electronic, mechanical, or other device that may be used for the nonconsensual interception of wire, oral, or electronic communications[.]" TEX. CODE CRIM. PROC. ANN. art. 18A.001(14).

obtained. *See* TEX .PENAL CODE ANN. § 16.02(b)(2) ("[a] person commits an offense if the person

. . . intentionally discloses or endeavors to disclose to another person the contents of a wire, oral,

or electronic communication if the person *knows or has reason to know* the information was

obtained through the interception of a wire, oral, or electronic communication in violation of this

subsection[.][emphasis added]"); *see also* TEX. PENAL CODE ANN. § 16.02(b)(3) ("[a] person

commits an offense if the person . . . intentionally uses or endeavors to use the contents of a wire,

oral, or electronic communication if the person *knows or is reckless* about whether the information

was obtained through the interception of a wire, oral, or electronic communication in violation of

this subsection[.][emphasis added]"). Finally, the disclosure or use of such content subjects to civil

liability the person who discloses or uses information that he/she knows or reasonably should know

was obtained by interception. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 123.002(a)(2) ("[a] party

to a communication may sue a person who . . . uses or divulges information that he *knows or*

*reasonably should know* was obtained by interception of the communication[.][emphasis added]")[3]

There are no exceptions in these statutes for parties or attorneys in civil proceedings.

Moreover, Appellant's specific allegations are that Jorge Ruiz, Appellant's estranged

husband, illegally intercepted and recorded her private conversations with third parties and then

invoked Fifth Amendment protections in the civil proceeding to avoid criminal prosecution for *his*

participation in the crime. Appellant further alleges that Ruiz's attorneys, who were informed these

interceptions occurred without consent and were therefore obtained in violation of criminal law,

did what their client legally could not—*disclose* and *use* the contents of the intercepted

---

3 Chapter 123 defines "interception" in relevant part as "the aural acquisition of the contents of a communication through the use of an interception device that is made without the consent of a party to the communication[.]" TEX. CIV. PRAC. & REM. CODE ANN. § 123.001(2).

communications to gain advantage in the civil proceeding for Ruiz. Ruiz's attorneys do not dispute these underlying facts, they merely dispute what they mean. The Court in its majority opinion sees no distinction between the conduct engaged in by these attorneys and what lawyers do on a regular basis, but a distinction does exist and it should be made clear. But, first, a clear recitation of the sequence of events in the divorce proceeding is necessary.

### *The Divorce Proceeding*

The record reflects that Ruiz filed a suit for divorce against Appellant in February 2017. The original petition, filed by attorney Mark Davis on Ruiz's behalf, sought joint managing conservatorship of the couple's only minor child and asked that Appellant be designated as the primary conservator. In April 2017, Appellant, by and through her attorney Doris Sipes, filed an amended counter-suit for divorce and several civil causes of action for intentional torts including assault, intentional infliction of emotional distress, invasion of privacy, and use of illegal electronic surveillance. The torts were based on allegations that Ruiz: beat Appellant, had recorded the couple having sex with his cell phone and then sent the recording to a third party, and had installed an "e-sonic voice-activated recorder" in Appellant's house. The counter-suit for divorce alleged that Appellant should be named sole managing conservator of the couple's minor child.

On July 25, 2017, Appellee Amy Nichols filed a motion to substitute herself in place of Mark Davis as attorney of record for Ruiz. On September 5, 2017, Appellee Andres E. Almanzan, entered his appearance for Ruiz "strictly in [Ruiz's] capacity as a Counter-Defendant . . . regarding the civil tort claims and causes of action asserted against him by the Counter-Plaintiff[.]" On August 25, 2017, Ruiz, by and through his attorney Nichols, filed an amended petition for divorce still seeking joint managing conservatorship of the minor child, but omitting the assertion that

6

Appellant should be designated primary conservator. By December 2017, the parties were engaged in discovery, and Ruiz, by and through his attorney Almanzan filed a motion to compel.

At the hearing on Ruiz's motion to compel, Almanzan introduced himself as "appearing for counter-defendant Jorge Ruiz, in his capacity as a counter-defendant in response to the . . . civil tort counterclaim. . . [for which Appellant was] seeking personal injury tort damages for claims involving alleged intentional infliction of emotional distress, alleged invasion of privacy, alleged unlawful surveillance, alleged, quote, illegal acts." Appellant, in defense of not producing certain audio and video recordings in her possession, which included a cell phone video of the couple having sex, sought a confidentiality agreement that would prohibit Ruiz and his attorneys from disclosing the contents of *that* material to third parties. The trial court asked the parties to work together to produce a mutually agreed confidentiality agreement to accommodate Appellant's concerns about the materials currently in her possession. At the time, however, neither Appellant nor her attorney were aware of the existence of the recordings of the intercepted communications made in Appellant's vehicle that are the subject of this appeal, despite having submitted a previous request for discovery to which such recordings would have been responsive.

On January 25, 2018, a "Confidentiality Agreement and Stipulated Protective Order," signed by the parties and their attorneys, was filed in the divorce case. The agreement limited the "scope of the agreement" to:

> Any and all audio or visual recordings or photographs in the possession of either party which are either requested in discovery requests or intended to be relied upon in court ***and which are of a sensitive nature*** shall be provided in a sealed envelope, box or other container and marked "CONFIDENTIAL", to the Court within 10 days of this order or 10 days following receipt of said items after execution of this order.

The agreement permitted the use of "confidential information" as that term was defined in the

agreement only for purposes of "discovery, litigation, trial and appellate purposes" unless written consent by the parties was given, or a court order was obtained permitting disclosure for another purpose.

Approximately two months later, on April 11, 2018, Nichols submitted to Appellant's attorney Ruiz's Fourth Supplemental Response to Appellant's discovery request in which Ruiz produced two USB drives containing the recordings of Appellant's intercepted communications that are the subject of this appeal. One of Appellant's discovery requests, originally served on March 21, 2017, while Mark Davis still represented Ruiz, sought the following information, to which Ruiz claimed on April 11, 2018, the USB drives were responsive:

> Request No. 2: Produce any and all audio tape recordings, digital recordings, still photographs, video recordings *which you intend to refer to or attempt to introduce into evidence at the time of trial* and which depict any act by VIANNEY D. ROBLES which you claim would support an unequal division of community property and/or show that she should not be named Sole Managing Conservator of the Child.

On April 26, 2018, counsel for Appellant filed a motion to sanction Ruiz related to the contents of the USB drives and the delay in their production, seeking among other things: (1) a referral of the "illegal recording to law enforcement for investigation and prosecution;" and (2) a court order prohibiting Ruiz from "using any recordings, whether aural or visual[.]"

On June 1, 2018 after receiving discovery requests from Appellant seeking details about the audio recordings contained on the USB drives, including the method of recording and source of authorization, Almanzan submitted responses by Ruiz in which Ruiz refused to answer the interrogatories, requests for production, and requests for admissions, and instead, Ruiz invoked his right to Fifth Amendment protections.

On October 9, 2018, a hearing was held to determine how the parties would proceed.

8

Attorney Almanzan again limited his appearance to only the "personal injury aspect of the case" but told the trial court that he and co-counsel Nichols intended to offer the contents of the audio recordings into evidence at trial in both the divorce and tort case because they "believe[d] that they are relevant to the claimant's character and activities that are relevant in both the family law case as well as the civil action case, Your Honor." Appellant's attorney in response, informed the trial court that she believed the recordings to be "illegal" and urged the trial court to first listen to evidence regarding the circumstances under which the recordings were made before listening to the actual recordings, which is what the trial court agreed to do.

On April 4, 2019, Appellant filed her Second Amended Counter-Suit for Divorce, which added a claim under Section 16.02 of the Texas Penal Code alleging that Ruiz had illegally intercepted Appellant's communications with third parties.

On April 5, 2019, a hearing was held on Appellant's motion to sanction Ruiz in relation to the contents of the USB drives. Appellant's attorney called Ruiz as a witness and asked him questions related to the circumstances in which the recordings were made, disclosed or used. Ruiz provided no answers, saying only "[a]s per my counsel's advice, I plead the Fifth." Appellant was also asked to testify. She said that Ruiz's voice was not present in the recordings, that she did not authorize the interceptions, that she was able to identify the voices of others on the recordings, who according to Appellant's attorney did not give permission to intercept the communications, and that, based on her review of the recordings, the interceptions began after she and Ruiz separated in February 2017 and ended in January 2018.

At the conclusion of the April 5, 2019 sanctions hearing, Almanzan informed the trial court that he had created a thirty-minute excerpt of the contents of the recordings contained on the USB

9

drives that he intended to offer into evidence at trial. The trial court then ordered Almanzan to transcribe that excerpt, which would be read into the record and translated into English by a Spanish interpreter, to which Almanzan agreed.

On April 24, 2019, Appellant filed a written objection to the transcription and translation of the contents of the intercepted communications on the basis that doing so would violate Texas Penal Code section 16.02 and Chapter 123 of the Texas Civil Practice and Remedies Code. The objection was filed along with a supplement to Appellant's motion for sanctions which sought temporary and permanent injunctive relief against Ruiz and his attorneys preventing them from using the recordings, and others, for any purpose including "to conduct further discovery based upon such information."

Appellant subsequently filed her civil action in this case against Ruiz's attorneys and their law firms on April 29, 2019 seeking injunctive relief to prevent further use and disclosure of the contents of the intercepted communications as well as monetary damages for each and every intercepted communication that was used or divulged by the attorneys, as permitted by chapter 123 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 123.004.

### *Appellees' Factual Arguments*

Here, Appellees argue that the conduct at issue falls within the scope of their representation of Ruiz, because it was their "duty to review the recordings at issue as potential evidence" in order to "protect[] their client against [Appellant's] allegations, and pursu[e] their client's legal interests." However, the record reflects that the attorneys did more than review the recordings for potential evidence against Ruiz in relation to Appellant's allegation that Ruiz had illegally

10

intercepted her oral communications. At the April 5, 2019 hearing, after listening to Ruiz "take the Fifth on the tapes" the divorce court expressed its opinion that the tapes were inadmissible because Ruiz would be unable to "prove them up." In response, Almanzan said:

> Not necessarily, Your Honor. Not necessarily. . . in civil cases, Judge, the–the method of the recording is irrelevant as long as the content of the recording is material, relevant and for impeachment purposes. We need not go through this futile exercise as to how the recordings were made because the case law that I cited for you. . . . there's really two issues that are being presented to you today. Number one, the source and the method of the recording, that's one subject matter. An entirely second and different subject matter is the content of the recordings. You don't have to know how a recording was made to be able to authenticate, "I hear that voice. That voice is hers. That voice is his. That voice is them. They're talking about this." Mr. Robles [sic] can plead the Fifth as to the origin and source of how the recording was made, while he can be examined and offer testimony as to whether or not he is familiar with the voices on those recordings and what they're talking about, who they're talking about and so forth, Your Honor. They're two different issues. And as I was saying earlier, you don't have to consider the first issue in a civil case. . . . I have cited Texas civil cases that stand for the proposition that the source of the material is irrelevant. You can even allege it was illegally recorded. That's still not a bar to its admission and use, as long as it's relevant and/or material and/or for impeachment purposes.

Apart from the questionable support for Almanzan's claim that the content of an intercepted communication is admissible if it is "material, relevant and [can be utilized] for impeachment purposes,"[4] the above-referenced argument fails to account for the fact that section 16.02 of the

---

4 In the divorce/tort proceeding, Almanzan argued he and Nichols could lawfully use for impeachment purposes in the civil proceeding the contents of the intercepted communications because doing so was "in the best interests of the child." But, even a cursory review of the authorities cited by Almanzan in support of the argument belies such an assertion. The civil statute giving rise to a cause of action for using and disclosing information obtained by interception of oral communications was enacted in 1985. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 123.002, Acts of 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3316 (eff. Sept. 1, 1985). Appellees cite no cases decided after the statute's enactment that hold intercepted communications can be used as evidence in civil proceedings, which is unsurprising because doing so is clearly illegal. Instead, Almanzan cited to *State v. Taylor*, 721 S.W.2d 541, 551(Tex. App.—Tyler 1986, writ ref'd. n.r.e.) which did not involve the use of intercepted communications. And the two cases that post-dated the enactment of Chapter 123 and that permitted the use of allegedly illegal recordings to impeach a mother in a child custody case were decided on the basis that the recordings were *not* illegal because consent was established. *See Allen v. Mancini*, 170 S.W.3d 167, 173 (Tex. App.—Eastland 2005, pet. denied) (holding that Chapter 123 was inapplicable because "[t]he tape recording was made with the consent of Mancini who was a party to some of the conversations on the tape. . . . We find that Mancini also had the authority to consent on behalf of [of the minor child]"); *see also, Kotrla v. Kotrla*, 718 S.W.2d 853, 855 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.) ("In this

11

Texas Penal Code does not limit the illegality of a person's conduct to *acquisition* of the recordings. Both section 16.02 and Chapter 123 of the Texas Civil Practice and Remedies Code make it illegal to *disclose and use* the *contents* of the intercepted communications for any purpose.

While it was Almanzan's duty to investigate his client's involvement in acquiring the illegal recordings and to determine whether his client was exposed to civil or criminal liability in relation to them, which would necessarily require a review of the recordings and which are duties well within the scope of representation, the above exchange demonstrates Almanzan went beyond performing those duties. By concluding that he and Nichols *could and would* use the *content* of the recordings *even* if they were illegally obtained--in direct contravention of the criminal and civil statute--to gain advantage in the civil proceeding, which was ostensibly the motivation behind Ruiz intercepting the communications in the first place, Almanzan crossed a line that now subjects him and his co-counsel to potential civil liability.

Moreover, the disclosure and use of the content of the recordings by these attorneys was not limited to their desire to "impeach" Appellant. Almanzan's arguments reveal his belief that Ruiz's attorneys could use the intercepted communications to coordinate, strategize and inform their cases against Appellant on issues unrelated to Ruiz's alleged illegal interception of Appellant's private communications. During the April 2019 hearing, Almanzan made clear that he had listened to the recordings with intent of using their ***content*** to develop Ruiz's case in the

---

case 'a party'. . . consented to the recording. [Chapter 123] is therefore inapplicable under these facts."). In his briefing here, Almanzan also cites *Bell v. American Traffic Solutions,* 371 Fed. Appx. 488 (5th Cir. 2010) in which a photograph used to prove a traffic offense was allegedly illegally obtained because the camera operator did not have an investigator's license. That case does not involve the use of intercepted communications, and when determining that the photograph in question could be legally introduced into evidence the court clearly distinguished the alleged "illegally obtained evidence" in that case from an intercepted communication. *See id.* at 490 n.1 ("unlike the Texas wiretapping statute. . . Texas law does not allow private citizens to sue to enforce [TEX.OCC.CODE ANN.] section 1702.101's licensing requirement or to seek injunctive relief against disclosure of information obtained without a license"). There is simply no basis, much less a good faith one, on which Appellees' arguments can stand.

divorce case:

> Judge for you to consider whether to admit evidence that's on the recordings you need to know what's on the recordings. The question has to be asked and answered, do the content of the recordings go to issues that are pertinent in this case?

And Almanzan repeatedly referenced the ***content*** of the recordings to justify its *use* in the tort and divorce proceeding:

> [B]ased on the content of the recordings, the sanctions should be denied, Your Honor. If you allow me an opportunity to present to you the content of the recordings, Your Honor. . . . we have a USB which essentially narrows down what we believe to be relevant, material and impeachable evidence down to 30 minutes, Judge. . .You are being called upon, pleaded upon, to take into consideration probative evidence of this woman's character for lying, for cheating, for possible drug use, for possibly putting her son in danger by who she associates with, Your Honor. That's why this is relevant and material, regardless of the [sic] whether or not it was illegally obtained, Your Honor.

Significantly, Appellees did not argue in the divorce/tort proceeding, nor do they argue here, that Appellant's oral communications were *not* illegally intercepted. Appellees do not allege, for example, that a person whose voice is on the recordings gave prior consent, or the recordings were received from a law enforcement agency that had legally obtained the recordings through an application filed under Title 18, United States Code, Section 2516. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 123.002(b) (excepting from civil liability interceptions and uses or disclosures of recordings authorized by Title 18). If the attorney conduct at issue had been limited to attempting to persuade the trial court that the communications were *not* illegally intercepted and could therefore be legally used in the civil proceeding, the immunity analysis would likely lead to a different conclusion.

But the record before us demonstrates that at a minimum the attorneys had reason to believe and should have known that Appellant's communications were illegally intercepted and that their

13

client was responsible for the interception. The record demonstrates that the attorneys knew: (1) neither Appellant, nor anyone else on the recordings, gave prior consent to the recordings; (2) Ruiz was in possession of the recordings and was in the best position to explain to his attorneys how he obtained them; (3) Ruiz had motive and opportunity to intercept the communications; and (4) Ruiz invoked his Fifth Amendment right to remain silent about who recorded the conversation and how he came to possess the recording. In addition, the recordings include a time period in which the civil proceeding was pending.

On these facts, Appellees' conduct is far from the type of conduct for which attorneys should be immune as a matter of law. Here, unlike the attorney conduct in *Bethel* and *Cantey Hanger*, Appellees cannot point to a duty they owed to their client to justify the use of content contained within the recordings because their client, who Appellant alleges broke the law when he intercepted her oral communications, does not have a common law, statutory or constitutional right to use the contents of those communications, and as a matter of fact is legally prohibited from doing so. And because an attorney owes no duty to accomplish for a client that which he could not legally accomplish on his own, *Poole*, 58 Tex. 134, the conduct committed by these attorneys fell outside the scope of representation that would protect them from a suit that was filed specifically to prevent them from further disclosing and using the intercepted communications. And the court's opinion suggesting an attorney can escape civil liability for such conduct as long as they can say they were representing their client when they engaged in it is an incorrect and misleading statement of the law and would encourage other attorneys and clients alike to engage in this type of conduct going forward.

In other words, Appellant's allegations do not amount to mere disapproval of how

14

Appellees performed their duties owed to Ruiz, she complains that their client had no right to intercept and record her oral communications and that Ruiz's attorneys, therefore, had no duty to *use* the content of those illegal interceptions to accomplish that which Ruiz legally could not, when they knew or reasonably should have known those recordings were obtained in violation of criminal law. There is simply no question that the actual or attempted disclosure or use of such content for any purpose with the requisite knowledge is itself illegal. The attorneys may doubt that Appellant can prove they knowingly engaged in such conduct, but there can be no doubt that such conduct falls *outside* of lawyerly duties owed to a client.

In short, the actual/attempted use/disclosure of intercepted oral communications by an attorney who knows or has reason to know those communications were illegally intercepted by their client or another falls *outside* the scope of client representation for which immunity attaches because doing so is prohibited by criminal statute and because attorneys owe no duty to a client to accomplish what their client legally could not. This is precisely the type of conduct for which attorney immunity is unavailable. Consequently, rather than be shielded from civil suit and liability, Appellees should be required to answer for their actions and show why injunction is not required and why they are not liable to Appellant.

### *The TCPA*

In addition, I would hold that the Texas Citizens Participation Act does not apply to Appellant's legal action because it is not based on, related to, or filed in response to Appellees' exercise of the right to petition. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)(2). Rather, the legal action is based on, related to and filed in response to the intentional criminal *conduct* committed by Appellees, which they have no right--constitutional or statutory--to pursue.

15

The majority relies on *Youngkin v. Hines*, 546 S.W.3d 675 (Tex. 2018) to hold that that the TCPA applies, but once again, the facts here are clearly distinguishable. In *Youngkin* the attorney was sued for *statements* he made on behalf of his clients regarding a Rule 11 Agreement that was agreed to by the opposing litigant, but which the opposing litigant later claimed was fraudulent. The Court observed that "Youngkin's alleged liability stems from his dictation of the Rule 11 agreement into the court record during trial. By any common understanding of the words, he made a statement in a judicial proceeding." *Id.* at 680 (referring to TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)((A)(i) (defining "Exercise of the right to petition" as "a communication in or pertaining to . . . a judicial proceeding[.]").

Here, the attorneys' alleged liability does not stem from statements or documents *they* made or authored in the divorce proceeding, it stems from the attorneys' repeated disclosure and use of *Appellant's* oral communications that the attorneys knew or reasonably should have known were illegally intercepted by their client or another. Moreover, the suit in this case was filed to stop these attorneys from further disclosing and using the contents of the intercepted communications, not to chill their right to petition.

For these reasons, I dissent.


                                          YVONNE T. RODRIGUEZ, Justice
August 19, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.

16